IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-50101
_____


UNITED STATES OF AMERICA,

                          Plaintiff-Appellant,
                          Cross-Appellee,

          versus

          SKIRVIN GEORGE JOHNSON,

                          Defendant-Appellee,
                          Cross-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
(A-90-CR-191)
_____
                     August 12, 1996
Before KING, WIENER, and BENAVIDES, Circuit Judges.

PER CURIAM[*]:

     The United States appeals from the district court's order

granting a new trial to Skirvin George Johnson on the basis that

the admission of illegally seized evidence in Johnson's first

trial was not harmless error.  We reverse the district court's

order granting a new trial and, after reviewing the arguments

raised by Johnson on his first appeal which were not addressed by

     [*] Pursuant to Local Rule 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

the earlier panel of this court, we reinstate Johnson's convictions and sentence.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

On February 14, 1991, Skirvin George Johnson was convicted by a jury of one count of theft from a federally funded program in violation of 18 U.S.C. § 666 and two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

A panel of this court initially vacated Johnson's convictions and remanded the case for a new trial based upon a violation of Johnson's Fourth Amendment right to be free from unreasonable searches and seizures. United States v. Johnson, 16 F.3d 69, 72 (5th Cir. 1994). This court determined that law enforcement officers obtained certain items, two of which were admitted into evidence at trial, from Johnson's briefcase at the time of his arrest in the course of a search that exceeded the scope of a proper search incident to arrest. Id.

In response to a motion for clarification by the government, this court issued a revised opinion indicating that it had not intended to order a new trial, but rather was remanding the case for the district court to determine (1) whether the admission of two illegally seized documents at trial was harmless error, and

2

(2) whether any other evidence admitted at trial was excludable as the fruit of the illegal search.  United States v. Johnson, 18 F.3d 293, 294 (5th Cir. 1994).

Accordingly, the district court held an evidentiary hearing, and determined that (1) the government had not proven that the admission of the two illegally obtained documents at trial was harmless error beyond a reasonable doubt, and (2) no other evidence admitted at trial was excludable as the fruit of the illegal search.

On December 20, 1994, the district court granted Johnson a new trial based upon its finding that the admission of tainted evidence was not harmless beyond a reasonable doubt.  The government timely filed a notice of appeal from this order.

**B. FACTS**

From October 1984 until June 1988, Johnson worked as a loan officer in the Community Development Department of the City of Phoenix, Arizona, which typically funded block grants from the Department of Housing and Urban Development ("HUD") to minority businesses.  During his tenure there, he made four suspicious loans, two of which are relevant to this appeal.

In March 1988, Johnson agreed to buy a park concession stand business with outlets in three Phoenix city parks from Everett Rand.  To pay for the business, Johnson funded a $42,000 loan

from the City of Phoenix in the name of Rand d/b/a Cortez Distributing.  Rand had never applied for a loan with the city in the amount of $42,000, and testified that he knew nothing about the loan.

At Johnson's direction, Rand opened a series of bank accounts at a Phoenix bank, into which the loan funds were deposited.  Rand presigned a series of checks from the bank accounts to allow Johnson to cover his expenses in running the concessions business.  Johnson paid Rand $25,000 for the business, which he subsequently renamed Combined Concessions, and he spent the remaining $17,000 of the loan proceeds operating the concessions business.

The concessions business's contracts with the city parks as well as all permits remained in Rand's name.  Johnson instructed his employees, including Betty Hoover and Victor Montgomery, not to reveal his ownership of the business to the City of Phoenix, admonishing them never to mention his name to a city employee.

In April 1988, Johnson funded a $58,000 loan from the City of Phoenix in the name of Wendell Wilson d/b/a American Products. Although the documentation of this loan is sketchy, the entire loan proceeds appeared to have been deposited into one of the accounts that Johnson had previously instructed Rand to open in connection with the loan for the purchase of the concessions business. Of the loan proceeds, $50,500 was then transferred into Johnson's personal account at First National Bank of Austin,

4

Texas, where Johnson established a $30,000 certificate of deposit, a $17,500 performance fund account, and a $3,000 personal account, all in his own name.

In June 1988, Johnson began working for the City of Austin as the Deputy Director of the Planning and Economic Development Department, and acted as a servicing officer in loan programs primarily financed by HUD.  While so employed, he funded a $250,000 loan on behalf of the City of Austin in the name of Hillary Richard Wright Industries, Inc. ("HRW").  The purported principals of HRW were Wendell Wilson and Eddie Manley, Johnson's brother-in-law.  Investigators determined that HRW was conducting no business, and was in essence an empty corporate shell.

Johnson delivered a $250,000 check from the City of Austin to Bank of the Hills, which, at Johnson's request, had agreed to service the HRW loan for the city.  This transaction was the basis for Johnson's indictment for theft from a federally funded program in violation of 18 U.S.C. § 666.

Johnson also delivered to the bank a letter containing disbursement instructions, pursuant to which the bank issued two cashier's checks.  One check, in the amount of $94,323.16, was made payable to J. McGee Co., and the second check, in the amount of $86,045.11, was made payable to Dunn's International Group.  The remainder of the $250,000 was deposited in an HRW account at Bank of the Hills.  The disbursements to J. McGee Co. and Dunn's International Group served as the basis for Johnson's first count

5

of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

The check payable to J. McGee Co. was deposited at the Petra International Bank in Washington, D.C. in an account styled Johnson McGee Co., to which Johnson was the only signator. On January 29, 1990, Johnson had Louise Dagher, a longtime family friend, purchase a $44,205.00 cashier's check with money from the Johnson McGee Co. account. Johnson delivered this check to the City of Phoenix along with a cover letter that he signed in an alias, Emmet Reed, indicating that the check was for payment in full of the loan that he had funded in the name of Rand d/b/a Cortez Distributing.

The cashier's check payable to Dunn's International Group was deposited in an account controlled by Wendell Wilson. Within two days of the deposit, $62,000 was used for the purchase of a cashier's check which was sent to the City of Phoenix as payment in full of the loan to Wilson d/b/a American Products.

Finally, in February 1990, $39,339.27 was transferred from the HRW account at Bank of the Hills to the Johnson McGee Co. account at Petra International Bank. Johnson had arranged for these funds to be used by his friend, Emmanuel Reeves, to purchase a parcel of real estate on behalf of Johnson McGee Co. This transfer was the basis of Johnson's second count of money laundering.

On May 16, 1990, Johnson was arrested in his Austin office by the Phoenix police. During the course of his arrest, eight

6

items were seized illegally from his briefcase.  After Johnson's arrest, computer disks containing documents connecting Johnson to the Phoenix concessions business and establishing Johnson's connection to HRW were discovered in Johnson's office and confiscated.[1]

Two of the items seized from Johnson's briefcase were entered into evidence: the government's Exhibit 110, a subpoena duces tecum for Gregory Rand d/b/a Cortez Distributing, and the government's Exhibit 111, a letter from the Arizona Department of Revenue regarding taxes due by Rand that included a photocopy of a check signed by Coy Curtis, an accountant for Cortez Distributing.  As stated above, we concluded on Johnson's first appeal that the search of Johnson's briefcase was unlawful, and we remanded for harmless error and fruit of the poisonous tree analysis.  On remand, the district court determined that admission of government's Exhibits 110 and 111 was not harmless error and therefore granted a new trial.  Additionally, the district court found that no other evidence admitted at trial was derived from or tainted by the illegal search.

## II. THE GOVERNMENT'S APPEAL

---

[1] In Johnson's first appeal, this court held that the seizure of the computer disks did not violate his Fourth Amendment rights.  <u>United States v. Johnson</u>, 16 F.3d at 73.

The government appeals from the district court's order granting Johnson a new trial on the basis that the admission of the government's Exhibits 110 and 111 at his trial was not harmless beyond a reasonable doubt. Johnson filed a motion to dismiss the government's appeal for lack of appellate jurisdiction. We shall first address the jurisdictional question, and then the merits of the government's appeal.

**A. JURISDICTION**

The government contends that this court possesses jurisdiction over its appeal pursuant to 18 U.S.C. § 3731. Section 3731 provides in pertinent part:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

18 U.S.C. § 3731 (emphasis added).

Johnson argues that this provision does not provide jurisdiction over the government's appeal, contending that the district court's new trial order was not entered "after verdict or judgment" because Johnson's convictions were vacated by this court before the new trial order was entered. Johnson, 16 F.3d at 74. We conclude that Johnson's argument lacks merit and that we possess jurisdiction over the government's appeal pursuant to

8

18 U.S.C. § 3731.

"[T]he legislative history [of § 3731] makes it clear that Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." United States v. Wilson, 420 U.S. 332, 337 (1975). The only constitutional barrier to a potential government appeal is the possibility of implicating the Double Jeopardy Clause. See United States v. Leal, 781 F.2d 1108, 1110 (5th Cir.),(noting that "[t]he availability of an appeal [by the government] depends not on statutory restrictions; rather only the double jeopardy clause of the Fifth Amendment limits the government's power to do so"), cert. denied, 479 U.S. 831 (1986); United States v. Aslam, 936 F.2d 751, 754 (2nd Cir. 1991)(holding that § 3731 is "a broad authorization [for the government] to appeal unless prohibited by the Double Jeopardy Clause").

A verdict was entered against Johnson by the jury at trial. The fact that his convictions were vacated on appeal does not change the fact that a verdict was rendered. The district court entered an order granting Johnson a new trial after rendition of a verdict, from which the government appeals. Therefore, the government's appeal comes within the plain language of section 3731. See 18 U.S.C. § 3731 (allowing appeal by the government from an order "granting a new trial after verdict or judgment").

Furthermore, no double jeopardy concerns are raised by the government's appeal because the government is trying to prevent

9

the grant of a second trial--i.e., it seeks to have Johnson's convictions reinstated--which in no sense places Johnson in jeopardy for a second time. "[W]here a Government appeal presents no threat of successive prosecutions, the Double Jeopardy Clause is not offended." United States v. Martin Linen Supply Co., 430 U.S. 564, 569-70 (1977); see Wilson, 420 U.S. at 344. Thus, if a reversal of the district court's order will simply result in a reinstatement of a jury verdict, then the Double Jeopardy Clause is not implicated. Leal, 781 F.2d at 1110. A successful appeal by the government in this case would merely result in reinstatement of the jury verdict; therefore, appellate review of the district court's order granting a new trial does not offend the Double Jeopardy Clause. Accordingly, we conclude that we possess jurisdiction over the government's appeal under 18 U.S.C. § 3731.

**B. HARMLESS ERROR**

At trial, the government admitted into evidence two documents found during the illegal search of Johnson's briefcase: the government's Exhibit 110, a subpoena duces tecum from the Arizona Department of Revenue for Rand d/b/a Cortez Distributing, and the government's Exhibit 111, a letter from the Arizona Department of Revenue regarding taxes due by Rand that included a photocopy of a check signed by Coy Curtis, an accountant for

10

Cortez Distributing. On remand and after an evidentiary hearing, the district court concluded that the admission of these two exhibits could not be considered harmless error, reasoning that the exhibits were "direct evidence taken from the defendant's possession, and no other evidence offered at trial was of like character."[2] The district court stated that it could not possibly determine that Exhibits 110 and 111 did not contribute to the jury's verdict because the court believed that Exhibits 110 and 111 were the only documentary evidence found in Johnson's possession which connected Johnson to Rand after Johnson had moved from Austin to Phoenix.

The government contends that the district court erred in

_____

[2] The district court explained why it considered these two exhibits to be of a different character than the remainder of the government's evidence:

> Further, the character of the evidence at issue is different from the testimony and other documentation the government offered. Exhibits 110 and 111, although only two of the 102 exhibits admitted at trial, were found in the defendant's possession and, indeed, comprised the only evidence actually found in the defendant's possession. The documents provided a direct connection between Everett Rand and the defendant after the defendant had moved to Austin from Phoenix. Such a connection was necessary to establish the money laundering charge, that is, that the Cortez loan was paid off through the Petra account with proceeds derived from the HRW loan in Austin. The testimony of witnesses, although corroborating the connection between the defendant and the Phoenix transactions, was subject to credibility determinations made by the jury. Actual documents found in the possession of a defendant reflected concrete affirmation of the live testimony.

11

concluding that the admission of Exhibits 110 and 111 was not harmless beyond a reasonable doubt. Specifically, the government challenges the district court's conclusion that Exhibits 110 and 111 were the only evidence of a connection between Johnson and Rand found in Johnson's possession. First, the government claims that the computer disks, which were also seized from Johnson's office, contain letters discussing the concessions business, thus establishing the same facts as Exhibits 110 and 111 were offered to prove--i.e., that Johnson was participating in the Phoenix concessions business while living in Austin. Additionally, the government maintains that Exhibits 110 and 111 could not have contributed to the verdict because they were cumulative of other evidence establishing the same facts, and formed a minimal part of the prosecution's case against Johnson. The government argues that the computer documents and Johnson's own admissions upon questioning by Officer Sterrett, as testified to by Sterrett, established that Johnson continued to participate in the Phoenix concessions business while in Austin. Finally, the government argues that the testimony of witnesses Rand, Betty Hoover, and Victor Montgomery also established the same facts which Exhibits 110 and 111 were offered to prove.

We review the grant or denial of a motion for a new trial under an abuse of discretion standard. United States v. Cooks, 52 F.3d 101, 103 (5th Cir. 1995). However, we conduct a de novo review of the record to determine whether constitutional trial

12

error is harmless beyond a reasonable doubt.  Arizona v.

Fulminante, 499 U.S. 279, 295-96 (1991); Lowery v. Collins, 988

F.2d 1364, 1372 (5th Cir. 1993).  "An order granting a new trial

will . . . be reversed when it is not supported by the reasons

given . . . ."  Fontenot v. Cormier, 56 F.3d 669, 676 (5th Cir.

1995).  Therefore, if we find that the district court incorrectly

concluded that the admission of Exhibits 110 and 111 was not

harmless error, we shall also find that it abused its discretion

in granting a new trial, as the reason for the new trial was the

finding that the admission of the tainted evidence was harmful.

"A constitutional error may be found harmless if the

beneficiary of a constitutional error proves beyond a reasonable

doubt that the error complained of did not contribute to the

verdict obtained."  United States v. Dotson, 817 F.2d 1127, 1135

(5th Cir. 1987) (citing Chapman v. California, 386 U.S. 18, 24

(1967)) (internal quotations and alterations omitted).  "The

question is not whether there was sufficient evidence on which

the petitioner could have been convicted without the evidence

complained of; rather, the question is whether there is a

reasonable possibility that the evidence complained of might have

contributed to the conviction."  Id. (citing Fahy v. Connecticut,

375 U.S. 85, 86-87 (1963)) (internal quotations and alterations

omitted); see Satterwhite v. Texas, 486 U.S. 249, 258 (1988).

In analyzing the record to determine whether the erroneous

admission of Exhibits 110 and 111 was harmless, we must first

13

determine the purpose for which the tainted evidence was introduced.  See United States v. Scarfo, 685 F.2d 842, 846 (3rd Cir.), cert. denied, 459 U.S. 1170.  Both parties agree that Exhibits 110 and 111--both items of correspondence from the Arizona Department of Revenue to Rand dated 1990 and found in Johnson's possession--were offered by the government to demonstrate that Johnson was involved with Rand in the operation of the concessions business after he had moved from Phoenix to Austin.  The government needed this connection to prove an element of the money laundering counts--i.e., that Johnson acted with the intent to promote the carrying on of specified unlawful activity.  The government's theory was that Johnson used the $250,000 Austin loan proceeds to pay off his two fraudulent Phoenix loans--the $58,000 loan to American Products and the $42,000 loan to Rand d/b/a Cortez Distributing, which later became Combined Concessions.  Thus, the government had to prove the existence of the two Phoenix loans and the connection between Johnson and the businesses to whom those loans were made.

In addition to Exhibits 110 and 111, the government offered other evidence establishing a connection between Johnson and Rand and the Phoenix concessions business.  However, the district court concluded that the admission of Exhibits 110 and 111 was harmful because these exhibits were different in character from the other evidence presented on this issue.  After reviewing the remainder of the evidence offered to prove the connection between

14

Johnson and the Phoenix concessions business, we conclude that there is no reasonable possibility that Exhibits 110 and 111 contributed to the jury's verdict; thus, the admission of the tainted exhibits is harmless beyond a reasonable doubt.

First, the district court incorrectly concluded that Exhibits 110 and 111 were different in character from the other evidence offered to show Johnson's continuing involvement with the Phoenix activities. The district court distinguished Exhibits 110 and 111 because (1) they were discovered in Johnson's possession--in his briefcase in his office, and (2) they were tangible documents not subject to credibility determinations. However, the government also admitted into evidence computer discs found in Johnson's office and a print-out of the documents found on these discs. The discs contained a 1989 letter from Rand to the City of Phoenix concerning the concessions business. The untainted computer discs and the documents contained thereon share the "unique" characteristics of Exhibits 110 and 111: (1) the discs were discovered in Johnson's possession--on his desk in his office; and (2) the discs and the print-outs were also tangible evidence not subject to credibility determinations. Therefore the computer discs and documents constitute evidence of the same character as Exhibits 110 and 111 establishing the same facts--that Johnson was involved with Rand in the operation of the concessions business after he moved from Phoenix to Austin.

15

Second, Johnson's own admissions to Officer Sterrett, as testified to by Sterrett, established the necessary connection between Johnson and the operation of the concessions business. Sterrett testified that Johnson admitted that he had forged Rand's signature on the documents necessary to obtain the loan from the City of Phoenix in the name of Rand d/b/a Cortez Distributing. He also admitted that he purchased and took control of the concessions business and renamed it Combined Concessions. He admitted that although he ran and owned the concessions business, it was still held in Rand's name. Johnson admitted that he used money from the Petra bank account to pay off the loan from the City of Phoenix to Combined Concessions. The significance of Exhibits 110 and 111 pales in comparison to Johnson's admissions that he forged Rand's signature to obtain the concessions loan and that he owned and operated the Phoenix concessions business. See Fulminante, 499 U.S. at 296 (stating that "[a] confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . ").

Third, the testimony of three witnesses also established that Johnson procured the fraudulent Phoenix loans and operated the Phoenix concessions business. Rand testified that Johnson agreed to purchase the concessions business from him, and that Johnson paid for the business with a check from the City of Phoenix. Rand stated that he knew nothing about the loan and

16

that he never gave Johnson permission to sign his name on the loan documents.  Betty Hoover, an employee of the concessions business, also testified that Johnson was the owner of the business, although she testified that Johnson instructed his employees not to reveal his ownership to the City of Phoenix.  Hoover testified that Johnson managed the daily affairs of the concessions business.  She testified that while Johnson was living in Austin, he called her three times a week to discuss the business operations of the concession stands and that he would travel to Phoenix about once a month to check on the concession stands.  Victor Montgomery, another employee of the concessions business, testified that Rand sold the concessions business to Johnson in 1988.  Montgomery also testified that Johnson operated the concessions business and communicated with the employees at least a couple of times a week while he was in Austin and Johnson would travel to Phoenix a couple of times a month.  This testimony clearly establishes the same facts for which Exhibits 110 and 111 were offered.

Finally, we note that Exhibits 110 and 111 were identified by Officer Sterrett during his testimony, but were not discussed or explained at that time.  The tainted exhibits were mentioned on only two pages of the over 1000-page trial transcript and they were not mentioned by the government during closing argument.  Exhibits 110 and 111 clearly did not constitute evidence relied on heavily by the prosecution. Cf. Fleming v. Collins, 917 F.2d

17

850 (5th Cir. 1990)(holding the admission of defendant's statement without Miranda warnings not harmless because the statements were "the core of the government's case against" the defendant, were relied on heavily by the prosecution during closing argument, and were obviously central to his conviction).

Considering the other evidence offered by the prosecution for the same purpose as Exhibits 110 and 111, and the fact that these exhibits were of minimal significance to the government's case against Johnson, we conclude that the admission of Exhibits 110 and 111 was harmless beyond a reasonable doubt. Accordingly, the district court abused its discretion in granting Johnson a new trial.

### III. JOHNSON'S ARGUMENTS ON APPEAL

Having concluded that the district court abused its discretion in granting Johnson a new trial, our next step would ordinarily be to reinstate Johnson's convictions. However, on his original appeal, Johnson raised several arguments which the earlier panel did not address. Johnson, 16 F.3d at 74. Additionally, as a result of this court's order directing the district court to conduct a "fruit of the poisonous tree analysis" on remand, Johnson raises an additional argument that the district court erred in conducting this analysis. Accordingly, we shall address Johnson's outstanding appellate

18

issues before deciding whether to reinstate his convictions.

## A. FRUIT OF THE POISONOUS TREE

Johnson contends that the district court erred in determining on remand that no other evidence admitted against him at trial should have been excluded as the fruit of the illegal search of his briefcase.  Specifically, Johnson claims that the testimony of Louise Dagher and all evidence pertaining to Petra International Bank, Johnson McGee Co., Coy Curtis and First City Visa was derived from and tainted by the illegal search of Johnson's briefcase.

At the evidentiary hearing, the government presented testimony of its investigating officers to demonstrate that each item of evidence introduced at trial other than Exhibits 110 and 111 was derived from some source other than the illegal search of Johnson's briefcase.  Based on this testimony and the notes of the investigating officers, the district court ruled that no evidence other than Exhibits 110 and 111 was tainted by the illegal search.

We review a district court's conclusions of law relating to a motion to suppress de novo.  United States v. Seals, 987 F.2d 1102, 1106 (5th Cir.), cert. denied, 114 S. Ct. 155 (1993).  We will accept the district court's findings of fact unless they are clearly erroneous.  Id.  In this case, the district court's

conclusion that no evidence admitted at trial should have been excluded as fruit of the illegal search is functionally equivalent to a denial of a motion to suppress; therefore, we shall review it as such.

"The derivative evidence rule, also known as the 'fruit of the poisonous tree doctrine,' requires exclusion of evidence that is the indirect product or 'fruit' of unlawful police conduct." United States v. Tedford, 875 F.2d 446, 450 (5th Cir. 1989). The purpose of the exclusionary rule is "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." United States v. Houltin, 566 F.2d 1027, 1030 (5th Cir.), cert. denied, 439 U.S. 826 (1978). The question asked in determining whether evidence is the fruit of an illegal search is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguished to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963); United States v. Caldwell, 750 F.2d 341, 343 (5th Cir. 1984), cert. denied, 471 U.S. 1007 (1985).

There are three situations in which evidence which is derived from illegal police conduct is "purged of its taint" and therefore admissible. United States v. Parker, 722 F.2d 179, 184 (5th Cir. 1983). First, derivative evidence should not be suppressed when "the connection between the illegal police

20

conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'"  Segura v. United States, 468 U.S. 796, 805 (1984)(citations omitted); see United States v. Brookins, 614 F.2d 1037, 1041 (5th Cir. 1980).  Second, under the independent source exception to the fruit of the poisonous tree doctrine, evidence is admissible if it was discovered by means wholly independent of the constitutional violation, even if the same evidence was also discovered during or as a consequence of illegal police conduct.  Murray v. United States, 487 U.S. 533, 537 (1988); Nix v. Williams, 467 U.S. 431, 443 (1984).  Finally, if the prosecution demonstrates by a preponderance of the evidence that tainted derivative evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible.  Murray, 487 U.S. at 539; Nix, 467 U.S. at 444.

After reviewing the record of the evidentiary hearing, we are persuaded that all evidence related to Petra International Bank, the Johnson McGee Co., the First City Visa account, Coy Curtis, and the testimony of Louise Dagher was derived from a source independent of the illegal search of Johnson's briefcase or inevitably would have been discovered.[3]

_____

[3] Johnson argues that the government has waived its independent source and inevitable discovery arguments because they were not raised before trial in relation to the motion to suppress.  However, this argument lacks merit because the government did not have a meaningful opportunity to present these arguments prior to the evidentiary hearing on remand.  See United

21

With regard to Johnson McGee Co. and the Johnson McGee account at Petra International Bank, Johnson contends that the government learned of Johnson McGee Co. and was directed to the Petra account by three blank checks off of that account that were discovered in his briefcase during the illegal search. However, Officer Sterrett testified that he knew of the Johnson McGee Co. on March 14, 1990--two months before the May 16, 1990 illegal search--when Rand faxed to him the purchase agreement covering the sale of the concessions business by Rand to Johnson McGee Co. Sterrett also testified that he had acquired a signature card on the Petra account, a corporate resolution statement from Petra International Bank, and an account agreement from Petra through a subpoena issued nearly a month before the search. Additionally, Officer Pardinek, who investigated the HRW loan in Austin, based his subpoena of records of the Petra account on references obtained through Bank of the Hills, which had issued a check to Johnson McGee Co. Pardinek testified that he did not review Officer Sterrett's list of items seized from Johnson's briefcase until May 31, 1990, after Pardinek had subpoenaed the Johnson

States v. Martinez, 974 F.2d 589, 591-92 (5th Cir. 1992) (the failure to advance a legal argument constitutes waiver only if the party has a meaningful opportunity to develop the theory and fails to do so). The government had no reason to argue that the evidence admitted at trial was not tainted by the illegal search before the evidentiary hearing on remand because Johnson's motion to suppress did not seek to exclude any derivative evidence but only the items seized from his briefcase and the computer discs subsequently seized from his desk.

McGee Co. account records from Petra.

Johnson also contends that the government derived evidence of his First City Visa account from a statement seized during the illegal search of his briefcase. Although Officer Sterrett testified that he did not know of Johnson's First City Visa account prior to the illegal search of Johnson's briefcase, the Visa account was discovered from an independent source by Officer Pardinek. Alternatively, the First City Visa account inevitably would have been discovered from an independent source through Pardinek's investigative efforts. Pardinek testified that he discovered a check payable to First City Visa for Johnson's account in the HRW bank records that he subpoenaed from Bank of the Hills before the illegal search. Also, Pardinek testified that during a lawful search of Johnson's residence after the illegal search, he discovered a receipt from a purchase made on the Visa account in Johnson's trash can. Pardinek then phoned the credit card company and determined which bank issued the card and then subpoenaed the First City Visa records.

As to the testimony of Louise Dagher, Johnson contends that the government became aware of her existence during the search of his safety deposit box, and that the affidavit supporting the warrant for the safety deposit box referred to items illegally seized from Johnson's briefcase. However, Officer Pardinek testified that he learned of Louise Dagher through some canceled checks payable to her which were included in the records that he

23

obtained from Petra International Bank.  Pardinek also testified that he learned of Louise Dagher from the canceled checks before he reviewed Sterrett's inventory of the briefcase on May 31, 1990.  Pardinek's daily notes corroborate this testimony. Therefore, we conclude that the testimony of Louise Dagher was obtained independently of the illegal search.

Finally, Johnson contends that the government discovered the existence of Coy Curtis and his address and telephone number from a check and telephone records seized from his briefcase. However, Sterrett testified that he learned Coy Curtis's identity and whereabouts from interviews with Betty Hoover and Victor Montgomery.  Sterrett also testified that he obtained Curtis's street address through a driver's license check.  Additionally, Curtis did not testify at trial and Sterrett testified that no evidence was obtained from Curtis.  Any evidence obtained from Coy Curtis was discovered independently of the illegal search.

Accordingly, we affirm the district court's holding that no other evidence admitted at trial should have been excluded as the fruit of the illegal search.

## B. SUFFICIENCY OF THE EVIDENCE

Johnson argues that the evidence was insufficient to support his convictions for one count of theft from a federally funded program in violation of 18 U.S.C. § 666 and two counts of money

24

laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  The
government responds that sufficient evidence supports Johnson's
theft and money laundering convictions.

### 1. Standard of Review

The scope of our review of the sufficiency of the evidence
after conviction by a jury is narrow.  United States v. Salazar,
66 F.3d 723, 728 (5th Cir. 1995).  We must affirm if a reasonable
trier of fact could have found that the evidence established
guilt beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S.
307, 319 (1979); United States v. Harris, 25 F.3d 1275, 1279 (5th
Cir.), cert. denied, 115 S. Ct. 458 (1994).  We must consider all
the evidence, all reasonable inferences drawn therefrom, and all
credibility determinations, in the light most favorable to the
verdict.  United States v. Resio-Trejo, 45 F.3d 907, 911 (5th
Cir. 1995).

### 2. Theft from a Federally Funded Program

Johnson was convicted of one count of theft from a federally
funded program in violation of 18 U.S.C. § 666 (count one).[4]  For

---

[4]Section 666 provides in relevant part:

(a) Whoever, if the circumstance described in
subsection (b) of this section exists--
    (A) embezzles, steals, obtains by fraud, or
    otherwise without authority knowingly converts to
    the use of any person other than the rightful
    owner or intentionally misapplies property that--
        (i) is valued at $5,000 or more, and
        (ii) is owned by, or is under the care,
        custody or control of such organization,
        government, or agency; or

25

the jury to find Johnson guilty on this count, the government had to prove that: (1) the City of Austin is a local government; (2) on or about October 12, 1989, Johnson was an agent of the City of Austin; (3) from January 1, 1989 to January 1, 1990, the City of Austin received more than $10,000 in federal assistance; and (4) on or about October 12, 1989, Johnson embezzled, stole, obtained by fraud or otherwise without authority converted to the use of any other person than the rightful owner, or intentionally misapplied property worth greater than $5,000 owned by the City of Austin. Johnson argues that the government failed to prove the fourth element of count one.[5] He argues that the evidence did not establish a connection between Johnson and HRW or the HRW account at Bank of the Hills.

After reviewing the record, we conclude that sufficient

-----

. . . .

shall be fined under this title, imprisoned not more
than 10 years, or both.
(b) The circumstance referred to in subsection (a) of
this section is that the organization, government, or
agency receives, in any one year period, benefits in
excess of $10,000 under a Federal program involving a
grant, contract, subsidy, loan, guarantee, insurance,
or other form of Federal assistance. . . .

18 U.S.C. § 666 (Supp. 1996).

[5] Although Johnson does not argue otherwise, we note that the government produced sufficient evidence supporting the first three elements: that Johnson was an agent of the City of Austin, which was a local government receiving over $10,000 in federal funds in the year 1989.

evidence exists upon which the jury could find that Johnson embezzled, stole or obtained by fraud $250,000 owned by the City of Austin. Johnson prepared a loan application to the City of Austin in the name of Hilary Richard Wright Industries, Inc. (HRW), a company purportedly owned by Eddie Manly and Wendell Wilson. However, several of the loan documents, such as HRW's business plan, were discovered on a computer disc in Johnson's office which also contained personal papers of Johnson's related to Combined Concessions--the Phoenix business which Johnson purchased from Rand with the proceeds of a loan the City of Phoenix had extended to Rand's business, Cortez Distribution. Additionally, the address listed on HRW's loan application was the address of Arthur Moseley's woodworking business. Moseley testified that no company named HRW existed at that address. In addition, the inventory list contained in HRW's loan file is absolutely identical to a list of the inventory of Moseley's woodworking business. Moseley testified that Johnson had previously handled Moseley's application for a minority business loan from the City of Austin, and that Moseley had given Johnson a detailed list of his inventory to support his loan application. Investigation by the City of Austin internal auditors, Austin Police Officer Pardinek, and IRS Agent Trevino could not locate an existing, operating business called HRW and could not locate either Manly or Wilson. There was ample evidence that HRW was not an existing business, and that Johnson created the

27

information on the HRW loan file to make it look legitimate. David Kreider, Johnson's supervisor at the City of Austin, testified that he signed the HRW check request and approved the loan without reviewing the loan file because he trusted Johnson completely in the handling of minority business loans.

Additionally, the evidence indicated that Wendell Wilson, the purported principal of HRW, was previously involved with a loan handled by Johnson on behalf of the City of Phoenix to a company called American Products. Tracing of the funds of the American Products loan revealed that Johnson received these funds. Investigation by the City of Phoenix into the American Products loan also suggested that American Products was a fictitious business. From the evidence of Wendell Wilson's connection with both American Products and HRW, the jury could have reasonably inferred that Johnson intended to obtain and/ or retain the $250,000 proceeds of the HRW loan.

The fact that the proceeds of the HRW loan were eventually deposited into an account on which Johnson was the sole signator also indicate that Johnson embezzled, stole or obtained by fraud the $250,000 belonging to the City of Austin. When the City of Austin prepared the check for the HRW loan, Johnson brought the check to Bank of the Hills and deposited it with the assistance of Powell Thompson, a vice-president of the bank. Thompson testified that Johnson handed him written instructions to use the $250,000 to obtain two cashier's checks and to open a checking

28

account at Bank of the Hills in the name of HRW.  After doing so, Thompson testified that he gave Johnson possession of the two cashier's checks.

Bank records indicate that one of the cashier's checks, made out to J. McGee Co., was eventually deposited into an account under the name of Johnson McGee Co. at Petra International Bank in Washington, D.C., on which Johnson was the sole signator. Several witnesses testified either that Johnson McGee Co. was a name under which Johnson did business, or that Johnson was the sole owner of that company.  The fact that Johnson had Thompson prepare the cashier's check to J. McGee Co., rather than Johnson McGee Co., suggests that Johnson was trying to conceal from Bank of the Hills that a company bearing his name would receive the proceeds of the HRW loan.  This suggestion is further evidence of Johnson's intent to steal, embezzle or obtain by fraud the $250,000.  Additionally, a few months later, an approximately $39,000 check written on the HRW account at Bank of the Hills was deposited into the Johnson McGee account at Petra International Bank.  Because the evidence demonstrates that Johnson prepared the HRW loan application with false information in the name of a nonexistent company, and because Johnson ultimately received the proceeds of the HRW loan, the jury could have reasonably concluded that Johnson stole, embezzled or obtained by fraud the $250,000 which the City of Austin loaned to HRW.  Therefore, sufficient evidence exists to support the jury's verdict as to

29

count one.

### 3. Money Laundering

Johnson was convicted of two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(counts two and three).[6] To convict Johnson of money laundering, the government must prove that Johnson: "(1) knew that the property involved in a financial transaction represented the proceeds of unlawful activity; (2) conducted or attempted to conduct a financial transaction which in fact involved the proceeds of specified unlawful activity; and (3) did so with the intent to promote the carrying on of the unlawful activity."  United States v. Restive, 8 F.3d 274, 280 (5th Cir. 1993), cert. denied, 115 S. Ct. 54 (1994).

Johnson argues that the government failed to prove each element of count two-- that Johnson had committed money laundering in obtaining two cashier's checks from Bank of the Hills with the proceeds of the HRW loan on October 12, 1989.

---

[6]Section 1956 provides in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
    (A)(i) with the intent to promote the carrying on of specified unlawful activity;
. . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(i) (Supp. 1996).

Johnson argues that the evidence shows that HRW purchased the cashier's checks through Manly and Wilson and that the City of Austin authorized the transfer of funds to the HRW account at Bank of the Hills.

After reviewing the record, we conclude that the evidence supports Johnson's conviction on count two. First, the evidence demonstrates that Johnson conducted a financial transaction on October 12, 1989, namely, that he caused Wilson to purchase two cashier's checks from Bank of the Hills on behalf of HRW in the amounts of approximately $94,000 and $86,000. Thompson testified that he issued these two checks per written instructions handed to him by Johnson, and that he delivered the cashier's checks to Johnson's possession. Second, the evidence indicates that the financial transaction involved the proceeds of unlawful activity and that Johnson knew that the property involved was the proceeds of unlawful activity. In response to Johnson's argument that the City of Austin authorized the issuance of the $250,000 check to Bank of the Hills, we note that the City of Austin's authorization of the $250,000 loan was based entirely on Johnson's representations to Kreider concerning HRW and its loan application. The evidence supporting count one also demonstrates that the money used to purchase the cashier's checks was the proceeds of unlawful activity--namely, Johnson's theft of $250,000 from the City of Austin in violation of 18 U.S.C. § 666. The jury could reasonably have inferred that Johnson knew that

31

the $250,000 was the proceeds of unlawful activity from the evidence establishing that Johnson stole, embezzled or obtained by fraud the $250,000.

Finally, the evidence demonstrates that Johnson purchased the cashier's checks with the specific intent to promote or carry on the unlawful activity of theft from a federally funded program. The tracing of the funds from the cashier's checks indicates that Johnson purchased the cashier's checks in an attempt to conceal the loan proceeds from the City of Austin, and also indicates that Johnson wanted to use the funds to pay off two of the Phoenix loans which were being questioned by his successor at the City of Phoenix economic development department.

The first cashier's check was in the amount of approximately $94,000 and was made out to J. McGee Co. This check was deposited into the Johnson McGee Co. account at Petra International Bank in D.C., an account on which Johnson was the sole signator. From the Johnson McGee Co. account, a $44,205 cashier's check made out to the City of Phoenix was obtained. This cashier's check was received by the City of Phoenix with a letter signed by Emmet Reed indicating that it was to be used to pay off the $42,000 loan to Cortez Distributing. The evidence established that Johnson had been the loan officer for the City of Phoenix on the Cortez Distributing loan, that he personally had received the proceeds of the Cortez Distributing loan, and that Johnson had used these funds to purchase the concessions

32

business from Rand.  Johnson previously had told Victor Montgomery that he sometimes used the name Emmet Reed.  Johnson also admitted to Officer Sterrett that he had sent this check to Phoenix to pay off the Cortez Distributing Loan.

The second cashier's check was in the amount of approximately $86,000 and was made out to Dunn International Group.  The evidence showed that Wendell Wilson deposited this amount in a bank account in the name of Dunn International in California.  The evidence also suggested that Dunn International was a fictitious business, as neither it nor Wilson could be found by investigators at the listed address of the business nor anywhere else.  No deposits of more than one or two hundred dollars were ever made into the Dunn International account other than the $86,000 cashier's check.  Soon after the cashier's check from the HRW loan was deposited into the Dunn International account, a cashier's check for $62,000 made out to the City of Phoenix was purchased with funds from the Dunn International account.  This $62,000 check was sent to the City of Phoenix with a letter purportedly signed by Wilson stating that the check was to be used to pay off the $58,000 American Products loan.  The evidence indicated that American Products was a fictitious company, that Johnson had received at least some of the proceeds of this loan, and that the City of Phoenix was inquiring into the business operations of American Products and the status of the loan three days before the two cashier's checks from the HRW

33

account at Bank of the Hills were purchased. The evidence regarding Johnson's involvement with the Phoenix loan transactions as well as the bank records tracing the two cashier's checks demonstrates that Johnson obtained the cashier's checks with the proceeds of unlawful activity and with the intent to promote or carry on the unlawful activity by concealing the proceeds of the HRW loan and by paying off the Phoenix loans to foreclose the City of Phoenix's investigation into those loans. Therefore, we conclude that sufficient evidence exists to support the jury's verdict as to count two.

As to count three, Johnson argues that the government failed to prove that Johnson transferred funds from the HRW account at Bank of the Hills to the Johnson McGee Co. and then to the City of Phoenix, that the funds were proceeds of theft, that Johnson knew the funds were proceeds of theft, and that Johnson had the specific intent to promote or carry on a specified unlawful activity. Johnson maintains that there is no evidence that he signed any HRW checks or caused them to be issued.

We conclude that the evidence is sufficient to support Johnson's conviction on count three. First, the evidence demonstrates that Johnson caused a $39,000 check to be issued from the HRW account at Bank of the Hills to Johnson McGee Co. The jury could reasonably infer that Johnson caused the $39,000 check to be issued, although Johnson did not sign the check, from fact that Johnson obtained the proceeds of the check. Second,

34

Bank of the Hills' records indicate that the $39,000 came from the proceeds of the $250,000 loan to HRW from the City of Austin. The evidence supporting count one also demonstrates that Johnson knew this money was the proceeds of unlawful activity and that it in fact was the proceeds of unlawful activity. Finally, the evidence that Johnson intended to use this $39,000 to purchase a parcel of real estate in the D.C. area demonstrates that Johnson participated in this financial transaction with the specific intent to promote or carry on unlawful activity. Bank records and the testimony of Emmanuel Reeves and Kashaka Kieta indicate that Johnson used these funds to pay a retainer to Kieta, a real estate broker, for his assistance in finding a parcel of real estate to be purchased by Johnson McGee Co. The purchase of real estate would have concealed the unlawfully obtained proceeds of the City of Austin $250,000 loan to HRW. Therefore, we conclude that there is sufficient evidence to support Johnson's conviction under count three.

## C. EVIDENTIARY RULINGS

Johnson argues that the district court erred in admitting evidence of the Phoenix loans because these were extraneous offenses for which Johnson was not charged. Johnson also argues that the probative value of this evidence is outweighed by its prejudicial effect. The government maintains that the district

court correctly admitted evidence relating to the Phoenix loans under Federal Rule of Evidence 404(b) because the Phoenix loans were relevant to proving Johnson's intent to keep the proceeds of the HRW loan, as well as, on the money laundering charges, Johnson's specific intent to promote or carry on the specified unlawful activity of theft from a federally funded program. Additionally, the government argues that the evidence of the Phoenix loans was inextricably intertwined with the evidence of the charged offenses, thus, it is admissible and not subject to rule 404(b) analysis.

We review the district court's rulings on the admissibility of evidence for abuse of discretion. United States v. McAfee, 8 F.3d 1010, 1017 (5th Cir. 1993); United States v. Jardina, 747 F.2d 945, 950 (5th Cir. 1984), cert. denied, 470 U.S. 1058 (1985). Federal Rule of Evidence 404(b) provides:

> **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b) (1996). We review alleged violations of Rule 404(b) under the two-pronged test of United States v. Beechum, 582 F. 2d 898, 911 (5th Cir. 1978) (en banc), cert.

36

denied, 440 U.S. 920 (1979).  That test requires us to verify (1) that the evidence of extraneous conduct is relevant to an issue other than a defendant's character, and (2) that the evidence possesses probative value that is not substantially outweighed by its undue prejudice and is otherwise admissible under Rule 403. Id.

After reviewing the record, we conclude that the district court did not abuse its discretion in concluding that evidence of Johnson's participation in the Phoenix loans was admissible as relevant evidence of his intent on the charged crimes, as well as his motive, particularly in light of the fact that the proceeds of the HRW loan were used by Johnson to pay off two of the Phoenix loans.  Additionally, we conclude that the probative value of this evidence was not substantially outweighed by any unfair prejudice to Johnson.[7]

## D. MOTION FOR CONTINUANCE

Johnson next argues that the district court's denial of his motion for a continuance deprived Johnson of his constitutional right to adequate time to prepare a defense.  The government responds that the district court did not abuse its discretion in

---

[7] We note that the district court instructed the jury very clearly that the evidence of the Phoenix loans should be considered only in determining state of mind, intent, motive, opportunity, plan, preparation, accident or mistake, and not used to determine whether Johnson committed the acts charged in the indictment.

denying Johnson's motion for a continuance.

The denial of a motion for continuance will be reversed only if the appellant demonstrates an abuse of discretion resulting in serious prejudice. United States v. Correa-Ventura, 6 F.3d 1070, 1074 (5th Cir. 1993); United States v. Webster, 734 F.2d 1048, 1056 (5th Cir.), cert. denied, 469 U.S. 1073 (1984).

Johnson was indicted on December 18, 1990 and John Emerson was appointed as counsel for Johnson on February 6, 1991. After several pre-trial proceedings and reschedulings of the trial, Johnson's trial was set for October 7, 1991. On October 3, 1991, Johnson moved for a continuance arguing that, because he believed the government intended to present evidence related to the Phoenix loans, he needed time to investigate, compile evidence, and prepare to defend against the Phoenix allegations. The district court granted Johnson's motion for continuance and reset trial for December 2, 1991. After two days of trial, the district court granted Johnson's motion for a mistrial in order for Johnson to obtain witnesses to defend against the Phoenix evidence.

Prior to the second trial, on January 27, 1991, Johnson sent a letter to Judge Sparks, indicating that, although he wished for additional preparation time to investigate and put on evidence defending against the Phoenix allegations, his attorneys disagreed that this was their best strategy and refused to file a motion for continuance. Judge Sparks treated Johnson's letter as

38

a motion for continuance.

At the hearing on Johnson's motion for continuance, Johnson's counsel indicated that he could not represent to the court that the witnesses Johnson wished to subpoena were necessary to present an adequate defense, as required by Federal Rule of Criminal Procedure 17(b). Further, Johnson's counsel explained to the court that, after considerable effort, he was unable to locate some of the witnesses Johnson wanted to testify, such as Eddie Manly and Wendell Wilson. Johnson's counsel told Judge Sparks that he did not file a motion for a continuance because he "felt like [he] ethically could not do so because [he] did not believe that there was a sufficient basis for [him] to ask the Court to continue this case . . . ."

Judge Sparks then denied Johnson's motion for continuance, reasoning that, although Johnson would have liked additional time, he did not need additional time, as his attorneys were prepared to proceed with trial and the government had disclosed all relevant discovery materials to Johnson and his attorneys.

After reviewing these facts and circumstances surrounding Johnson's request for a continuance, we conclude that the district court did not abuse its discretion by denying the motion.

**E. PROSECUTOR'S COMMENTS**

Johnson also argues that the prosecutor's comments during closing argument deprived him of a fair trial. Johnson complains that (1) the prosecutor referred to him as a "white collar criminal,"[8] (2) the prosecutor shifted the burden of proof onto the defense, and (3) the prosecutor misrepresented to the jury Johnson's ability to subpoena witnesses.[9]

"In reviewing a claim of prosecutorial misconduct, [we] first determine whether the prosecutor's remarks were improper

---

[8] Johnson challenges the following statement in the prosecutor's argument:

A criminal--Mr. Drug Kingpin in a drug case never puts his hands on the dope, but that doesn't mean he's not the one that sells it. Mister white collar criminal may not put his hands on all of the checks that are moving the money around the country . . . .

[9] Johnson claims that the following argument by the prosecutor shifted the burden of proof and misrepresented Johnson's ability to subpoena witnesses:

You can see [that defense counsel] are very well prepared. You can see the boxes they have. They get discovery from the Government. They had Sterrett's report. They had Trevino's reports. They had all of the documents way ahead of time. There is no sandbagging here. They also have subpoena power like the Government. If he wanted the tax returns of Everett Rand, he knew he was going to be a witness; why didn't he subpoena them? If he wanted Victor Montgomery's records, whey didn't he subpoena them. You are entitled to ask yourself why he didn't do that. They have got every bit of the subpoena power that the United States Government has. They have the power of the United States District Court.

40

and, second, whether they prejudicially affected the substantive rights of the defendant." United States v. Fields, 72 F.3d 1200, 1207 (5th Cir. 1996), petition for cert. filed, 64 U.S.L.W. 3709 (U.S. Apr. 8, 1996)(No. 95-1639); United States v. Lokey, 945 F.2d 825, 837 (5th Cir. 1991). We consider: "(1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction given; and (3) the strength of the evidence of the defendant's guilt." Fields, 72 F.3d at 1207; Lokey, 945 F.2d at 837. "[R]eversal for improper prosecutorial statements is required only where the statements cast 'serious doubt on the jury's verdict.'" Lokey, 945 F.2d at 838 (citations omitted).

Johnson first contends that he was deprived of a fair trial because the prosecutor referred to him as a white collar criminal during closing argument. Although this argument may have been improper, we conclude that it did not prejudice Johnson's substantial rights. The "white collar criminal" comment was one isolated reference to which defense counsel immediately objected. The district court sustained the objection and instructed the jury to disregard. The district court also, during its charge, instructed the jury that the lawyer's arguments are not evidence. As recited above, ample evidence supports Johnson's convictions. The prosecutor's statement does not cast serious doubt on the jury's verdict. Therefore, we conclude that the prosecutor's reference to Johnson as a white collar criminal was not

41

prejudicial and does not require reversal.

We conclude that Johnson's second and third contentions, that he was deprived of a fair trial because the prosecutor's argument shifted the burden of proof and misrepresented his ability to subpoena witnesses, are without merit. We note that Johnson did not object to these prosecutorial statements at trial; therefore, we review them for plain error. See United States v. Robles-Pantoja, 887 F.2d 1250, 1256 (5th Cir. 1989).

First, as to Johnson's contention that the prosecutor shifted the burden of proof, we note that the prosecutor explained to the jury immediately before the challenged argument that the defendant has no burden and need not put on any evidence.[10] The prosecutor also properly described the burden of proof earlier in his closing argument.[11] Furthermore, the

---

[10] The portion of the prosecutor's argument challenged by Johnson and cited in his brief was immediately preceded by the following statements by the prosecutor:

Mr. Emerson said he didn't have the tax return of Everett Rand, and he didn't have Mr. Montgomery's records. He pointed that out to you. I want to be very careful here. The defendant in a case has no burden. He doesn't have to produce any evidence, and that should not be held against him; and if you do, you cause problems for everybody. So don't do that. . . .

[11] The prosecutor acknowledged to the jury that he had the burden to prove guilt beyond a reasonable doubt:

First, the Court will tell you that the Government has the burden of proof to prove the elements of the offenses alleged . . . It's a burden that the Government has to get the witnesses in here, find out they are witnesses, get them here, present them to you

42

district court properly instructed the jury that the prosecution bears the entire burden of proof and that the defendant need not present any evidence.  See United States v. Jordan, 49 F.3d 152, 158-59 (5th Cir. 1995). Therefore, Johnson's argument that the prosecutor's comments shifted the burden of proof is meritless.

Second, as to the prosecutor's comments regarding Johnson's ability to subpoena witnesses, those statements were responsive to Johnson's counsel's closing argument.  We examine "the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect." Fields, 72 F.3d at 1207.  During Johnson's counsel's closing argument, he challenged Rand's and Montgomery's credibility and told the jury that he was unable to cross-examine Rand and Montgomery on key points because he did not have Rand's tax returns or Montgomery's bank records.  The challenged prosecutorial comments were clearly an attempt to rebut this argument by pointing out that Johnson's counsel could have obtained those records if he wished.  Because we conclude that these comments do not cast serious doubt on the jury's verdict, we find that the prosecutor's comments regarding Johnson's ability to subpoena witnesses do not require reversal.

Johnson finally argues that even if the three allegedly improper portions of the prosecutor's argument individually do

. . . .

43

not require reversal, cumulatively they denied Johnson a fair trial.  We conclude that even considered cumulatively, the challenged portions of the prosecutor's argument do not cast serious doubt on the jury's verdict so as to require reversal. See United States v. Neal, 27 F.2d 1035, 1051-52 (5th Cir.), cert. denied, 115 S. Ct. 530 (1994), and cert. denied, 115 S. Ct. 1165 (1995).; United States v. Moye, 951 F.2d 59, 63 n.7 (5th Cir. 1992) (holding that "[b]ecause we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail").

Accordingly we conclude that the prosecutor's statements challenged by Johnson do not require reversal.


### IV. CONCLUSION

We conclude that: (1) the district court erred in finding that the admission of Exhibits 110 and 111 at trial was harmful error requiring a new trial; (2) the district court correctly determined that no other evidence admitted at Johnson's trial was fruit of the illegal search of Johnson's briefcase; (3) there was sufficient evidence to support Johnson's convictions; (4) the district court did not err in admitting evidence related to the Phoenix loans; (5) the district court did not err in denying Johnson's motion for continuance; and (6) the prosecutor's closing argument did not deprive Johnson of his right to a fair

44

trial.  For the foregoing reasons, we REVERSE the district court's motion for new trial, and we REINSTATE Johnson's convictions and sentence.